**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMANDA CLARK,
Plaintiff,

v.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

Defendant.

Index No.:

**VERIFIED COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

1. This is a pregnancy discrimination case about an employer—a top 5 global academic institution—that praised an employee, planned for her future, and then ended her job just weeks after she disclosed that she was pregnant.

2. Plaintiff Amanda Clark, DVM, is a board-certified veterinary pathologist. She joined the postdoctoral training program in the Division of Comparative Medicine at Defendant Massachusetts Institute of Technology ("MIT" or the "Institute"), where she performed necropsies, examined and interpreted microscopic tissue, and authored pathology reports that MIT's veterinarians and researchers relied upon.

3. While there, Dr. Clark was not disciplined, was not given any warnings, and was not notified of any performance problems.

4. On April 28, 2026, Dr. Clark told her supervisor she was pregnant.

5. In the days that followed, her supervisor made a series of hostile, pregnancy-related remarks.

6. Dr. Clark also asked MIT to protect her and her unborn child from noxious laboratory chemicals, and she reported her supervisor's comments to Division leadership.

7. Roughly five weeks after she disclosed her pregnancy, MIT told Dr. Clark that her job was ending.

8. MIT she had "successfully completed" her fellowship because she had passed her board examinations approximately eight months earlier, a rationale MIT had never once mentioned before she disclosed her pregnancy.

9. Notably, MIT also failed to provide the advance notice that its own policies required before ending a postdoctoral appointment, and as a result could not end her appointment at the close of the academic year as it otherwise would have done—instead pushing her end date back to September 4, 2026.

10. That MIT missed the window to act at the end of the academic year is telling: MIT had known since October 2025 that Dr. Clark had passed her boards, and if board passage truly "completed" her fellowship, MIT had ample time to provide timely notice months before Dr. Clark disclosed her pregnancy.

11. But, MIT did not notice Dr. Clark's termination until shortly after Dr. Clark disclosed her pregnancy and complained to Division leadership about her supervisor's comments that indicated hostility to her pregnancy.

12. Dr. Clark's supervisor, Dr. Magalie Boucher, then admitted that funding was available for another year and that MIT would advertise Dr. Clark's "exact position." MIT did just that, posting the same job at an overlapping salary, with a start date just days after Dr. Clark's departure.

13. MIT's shifting explanations do not withstand scrutiny. The real reason MIT ended Dr. Clark's employment was her pregnancy, her request for a pregnancy-related accommodation, and her report of pregnancy discrimination. Dr. Clark brings this action to recover the wages, benefits, and career opportunity she lost, and to be compensated for the severe emotional distress MIT inflicted, in violation of the Massachusetts anti-discrimination

statute, G.L. c. 151B (including the Massachusetts Pregnant Workers Fairness Act); Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e et seq.; and the federal Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg et seq.

## PARTIES

14. Plaintiff Amanda Clark is a resident of Plymouth, Plymouth County, Massachusetts. She was employed by MIT in the Division of Comparative Medicine, most recently as a Postdoctoral Associate, from November 2024 until her separation on September 4, 2026. At all relevant times, Dr. Clark was an "employee" within the meaning of G.L. c. 151B, § 1, and a covered employee within the meaning of Title VII and the federal Pregnant Workers Fairness Act.

15. Defendant Massachusetts Institute of Technology is a top 5 global academic institution organized and existing under the laws of the Commonwealth of Massachusetts, with a principal place of business at 77 Massachusetts Avenue, Cambridge, Middlesex County, Massachusetts 02139. MIT's Division of Comparative Medicine, where Dr. Clark worked, is located at 77 Massachusetts Avenue, Cambridge, Massachusetts. At all relevant times, MIT employed six or more persons and was an "employer" within the meaning of G.L. c. 151B, § 1, and employed fifteen or more persons and was a covered "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), and the federal Pregnant Workers Fairness Act.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over Plaintiff's claims under Title VII and the federal Pregnant Workers Fairness Act pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), which applies to claims under the federal Pregnant Workers Fairness Act through 42 U.S.C. § 2000gg-2(a)(1). This Court has supplemental jurisdiction over Plaintiff's claims under G.L. c. 151B pursuant to 28 U.S.C. § 1367(a) because those claims are so related to her federal claims that they form part of the same case or controversy under Article III of the United

States Constitution. This Court may grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

17. Dr. Clark has satisfied all administrative prerequisites to suit. She timely filed a verified Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") as Charge No. 2026EM02708, cross-filed with the Equal Employment Opportunity Commission ("EEOC") as EEOC Charge No. 16C-2027-00010, alleging the discriminatory and retaliatory conduct described herein, within 300 days of the unlawful conduct as required by G.L. c. 151B, § 5. This action is brought within the limitations period prescribed by G.L. c. 151B, § 9. On October 6, 2026, the EEOC dismissed the Charge and issued Dr. Clark a Notice of Right to Sue with respect to her claims under Title VII and the federal Pregnant Workers Fairness Act. This action is brought within ninety days of her receipt of that Notice.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Defendant MIT resides in this District, the unlawful employment practices alleged herein were committed in this District, the employment records relevant to those practices are maintained and administered in this District, and Dr. Clark would have continued working in this District but for those practices. Assignment to the Eastern Division is proper under Local Rule 40.1(d) because all parties reside in the Eastern Division and the claims arose there.

## FACTUAL ALLEGATIONS

### *Dr. Clark's Qualifications and Employment*

19. Dr. Clark is a veterinarian and a board-certified veterinary pathologist. She holds a Doctor of Veterinary Medicine (DVM) and a Master of Veterinary Science (MVSc), and she is a Diplomate of the American College of Veterinary Pathologists (DACVP).

20. Dr. Clark began working at MIT's Division of Comparative Medicine in November 2024, initially as a temporary employee covering another pathologist's leave of absence.

21. Her work impressed the Division, and MIT asked her to stay.

22. By written offer dated June 20, 2025, MIT hired Dr. Clark into its postdoctoral training program in comparative anatomic veterinary pathology as a Postdoctoral Associate, with a start date of July 1, 2025, and a first-year salary of $80,230.

23. As a pathologist in the Division, Dr. Clark performed demanding, specialized work. She conducted gross necropsies on laboratory animals, dissected and trimmed formalin-fixed tissues, examined and interpreted microscopic slides, diagnosed disease, and authored the comprehensive gross and histopathology reports on which MIT's clinical veterinarians and research scientists relied. She communicated her findings to research personnel and participated in the Division's pathology rounds and seminars.

24. Dr. Clark performed her duties with skill and dedication. MIT never disciplined her, never issued her a warning, and never documented a single performance concern.

25. The offer that MIT extended to Dr. Clark plainly contemplated a multi-year relationship. It referenced conference funding "during [her] time as a trainee," four weeks of leave "in subsequent years," and the opportunity to apply to a PhD program "during [her] 2nd year."

26. At no point during her interviews, her onboarding, or in any written communication did MIT tell Dr. Clark that passing her board examinations would end her appointment.

27. No document MIT provided to Dr. Clark described passing her board examinations as the goal or endpoint of the program.

28. In October 2025, Dr. Clark passed her American College of Veterinary Pathologists board examinations.

29. MIT knew of her results at the time, raised no concern, and made no change to her employment. No one at MIT told Dr. Clark that she would have to leave.

30. MIT offered Dr. Clark career counseling in the months following her passing her board examinations, but never suggested that her appointment would not be renewed until after her pregnancy was disclosed months later.

31. For approximately eight months thereafter, she continued in her role without any suggestion that passing her boards had "completed" her fellowship, exhausted her funding, or otherwise required her departure.

***Dr. Clark Discloses Her Pregnancy***

32. On April 28, 2026, Dr. Clark disclosed her pregnancy to her direct supervisor, Dr. Magalie Boucher, the Division's Assistant Director and Comparative Pathologist. With Dr. Boucher's knowledge, Dr. Clark also informed the Division's Director, Dr. Kelly Metcalf Pate. Dr. Pate responded warmly, congratulating Dr. Clark on the news.

33. Dr. Clark's due date was in December 2026.

***Dr. Boucher's Pregnancy-Related Comments***

34. In the days after Dr. Clark disclosed her pregnancy, Dr. Boucher subjected her to a series of hostile, pregnancy-related remarks.

35. When Dr. Clark sought guidance on a necropsy case, Dr. Boucher grew visibly frustrated and questioned why Dr. Clark had said she could work "on the floor" when she "clearly knew" she was pregnant.

36. Dr. Clark abruptly departed the lab and returned to her office where she cried for an hour.

37. During a check-in meeting the next day, Dr. Boucher told Dr. Clark that she was "probably emotional from the pregnancy."

38. Dr. Boucher then turned the conversation to miscarriage, telling Dr. Clark that "miscarriage is a part of life and it happens more than we realize," and that if Dr. Clark were to have a miscarriage "it would be unfortunate, but [she] could just try to get pregnant again."

39. Dr. Boucher told Dr. Clark that she had "caused [herself] a lot of extra stress by willingly putting [herself] in a situation that [she] couldn't handle while knowing [she] was pregnant."

40. Dr. Clark was visibly upset and crying as Dr. Boucher made these comments.

41. Dr. Boucher's comments were demeaning, unwelcome, and directed at Dr. Clark *because* she was pregnant. They made a difficult time in Dr. Clark's life far worse and left her feeling ashamed of her pregnancy in her own workplace.

***Dr. Clark Reports the Discrimination to Division Leadership***

42. In early May 2026, Dr. Clark reported Dr. Boucher's pregnancy-related comments and conduct to Division leadership, including to Keith Kun, the Division's Director of Administration and Finance, and to the Division's Director, Dr. Pate.

43. MIT held a follow-up meeting. When asked, Dr. Clark told MIT that she did not consider the matter resolved and reiterated her concerns that the pregnancy-related comments were inappropriate.

44. MIT told Dr. Clark that it could not speak for her supervisor and advised her to raise any future issues as they arose.

45. Dr. Pate and Mr. Kun told Dr. Clark to bring any future complaints directly to them rather than through any formal complaint process, and neither referred her to MIT's formal complaint procedures.

46. MIT was on unmistakable notice that Dr. Clark had complained of pregnancy discrimination.

47. Dr. Boucher never apologized to Dr. Clark for her pregnancy-related comments and never approached Dr. Clark about them, either before or after Dr. Clark reported them.

***Maternity Leave Discussions Assumed Continued Employment***

48. On or about May 7, 2026, Dr. Clark met with Keith Kun to discuss her pregnancy and her leave. They discussed maternity and bonding leave beginning around her December 2026 due date and continuing into early 2027, how Dr. Clark should structure that leave, and what her pay would look like.

49. Mr. Kun recommended that Dr. Clark reach out to request maternity leave formally in approximately October 2026, roughly two months before her due date.

50. Nothing in that discussion suggested that Dr. Clark's position was ending.

51. To the contrary, MIT's own planning assumed that Dr. Clark would remain employed well into 2027.

***MIT Ends Dr. Clark's Employment***

52. On June 4, 2026, only about five weeks after Dr. Clark disclosed her pregnancy and shortly after she reported discrimination to Division leadership, MIT told Dr. Clark that her employment was ending.

53. Dr. Pate delivered the news during what Dr. Clark had been told was an annual performance check-in. Dr. Pate told Dr. Clark that because she had passed her boards in October 2025 she had "fulfilled the requirements of the program," that it "wouldn't be ethical to keep paying [her] as a post doc when [she is] a boarded pathologist," and, separately, that MIT's funding was a contributing factor.

54. Dr. Clark was blindsided.

55. That same day, MIT delivered Dr. Clark a written notice, signed by Dr. Pate, stating that she had "successfully completed" her fellowship and setting a final appointment date of September 4, 2026.

56. Before informing Dr. Clark that her employment was ending, MIT had issued her no warning, taken no disciplinary action, and documented no performance concern.

57. Its written notice instead praised her accomplishments.

58. When that decision to end Dr. Clark's employment was made, Dr. Pate knew that Dr. Clark was pregnant and that she had complained about Dr. Boucher's pregnancy-related comments.

***MIT Did Not Give the Notice Its Own Policies Required***

59. MIT's own policy requires MIT to give a postdoctoral appointee at least ninety days' written notice before ending or declining to renew an appointment.

60. Dr. Clark's appointment ran on an appointment year ending June 30. Had MIT believed that passing her boards in October 2025 completed Dr. Clark's fellowship, it had ample time to give timely notice and end her appointment at the close of the academic year on June 30, 2026.

61. To do so, MIT needed to give notice by approximately March 31, 2026, roughly five months after she passed her boards and one month *before* Dr. Clark disclosed her pregnancy.

62. MIT gave no such notice.

63. MIT first raised the end of Dr. Clark's appointment on June 4, 2026, after Dr. Clark had disclosed her pregnancy and complained about Dr. Boucher's comments.

64. Because MIT had missed the notice window, it could not end her appointment on June 30 and instead set a final appointment date of September 4, 2026, exactly three months after its notice.

***The Stated Reasons Were Shifting and Pretextual***

65. Later on June 4, 2026, Dr. Boucher told Dr. Clark a very different story. Dr. Boucher said that MIT was in fact receiving funding for another postdoctoral pathology fellow for another year, and that MIT would advertise Dr. Clark's "exact position," likely while Dr. Clark was still employed.

66. MIT then did exactly that. It posted a "Postdoctoral Fellowship in Comparative Anatomic Veterinary Pathology," the same role Dr. Clark held in the same comparative anatomic veterinary pathology training program into which MIT had hired her, with substantially overlapping duties, including necropsy and gross pathology, histopathology, diagnostic and experimental pathology support, reports, and research publications. The posting listed a duration of one to two years, a salary range of $73,308 to $90,000 that overlapped Dr. Clark's $80,230 salary, and a start date of September 8, 2026, days after Dr. Clark's departure.

67. MIT's stated reasons for ending Dr. Clark's employment do not withstand scrutiny. Dr. Clark passed her boards approximately eight months before MIT first invoked board passage as the reason her appointment had to end, and MIT did so only after she disclosed her pregnancy, requested a pregnancy-related accommodation, and reported pregnancy discrimination.

68. MIT offered multiple, shifting rationales, including program completion, the "ethics" of paying a boarded pathologist at a post-doc rate, and funding.

69. Its funding rationale was contradicted by Dr. Clark's own supervisor, Dr. Boucher, and by its decision to fund and advertise a comparable position at an overlapping salary.

70. No warning, no discipline, and no documented performance concern supported the decision to end Dr. Clark's employment.

71. The real reason MIT ended Dr. Clark's employment was her pregnancy, her request for a pregnancy-related accommodation, and her report of pregnancy discrimination. To the extent the individuals who delivered the decision were not themselves the source of the discriminatory animus, Dr. Boucher's bias is imputed to MIT where, as here, it influenced the outcome.

***Damages***

72. As a direct and proximate result of MIT's unlawful conduct, Dr. Clark has suffered and continues to suffer substantial harm. She lost her employment and her annual salary of $80,230, together with her employer-provided benefits, and she lost the career and training opportunity she had expected to continue.

73. MIT's conduct also caused Dr. Clark severe emotional distress, anxiety, and stress, at a time when she was pregnant and least able to absorb such harm. She has sought and obtained mental health treatment as a result. She now carries acute anxiety about how she will support herself and her family and maintain healthcare coverage.

## CAUSES OF ACTION

### COUNT I
**Pregnancy Discrimination - Disparate Treatment**
**(G.L. c. 151B, § 4(1))**
***Against Defendant Massachusetts Institute of Technology***

74. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

75. G.L. c. 151B, § 4(1) makes it an unlawful practice for an employer to discharge from employment or otherwise discriminate against an individual in the terms, conditions, or privileges of employment because of pregnancy or a condition related to pregnancy.

76. At all relevant times, Plaintiff was pregnant and was qualified to perform, and was performing, the essential functions of her position.

77. Defendant took adverse employment action against Plaintiff because of her pregnancy, including by ending her employment.

78. Defendant's stated reasons for ending Plaintiff's employment were pretextual. The true motivating factor was Plaintiff's pregnancy.

79. To the extent the individuals who made or communicated the decision to end Plaintiff's employment did not themselves harbor discriminatory animus, Dr. Boucher's discriminatory animus influenced that decision and is attributable to Defendant.

80. Defendant's conduct was outrageous and egregious, and was undertaken intentionally or with reckless indifference to Plaintiff's rights under G.L. c. 151B, warranting an award of punitive damages.

81. As a direct and proximate result of Defendant's discriminatory conduct in violation of G.L. c. 151B, § 4(1), Plaintiff has suffered and continues to suffer lost wages, lost benefits, lost earning capacity, and severe emotional distress, for which she is entitled to damages and other relief.

## COUNT II
**Pregnancy Discrimination - Hostile Work Environment**
**(G.L. c. 151B, § 4(1))**
***Against Defendant Massachusetts Institute of Technology***

82. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

83. G.L. c. 151B, § 4(1) prohibits discrimination against an employee in the terms, conditions, or privileges of employment because of pregnancy, including subjecting an employee to a hostile work environment because of pregnancy.

84. Defendant, through Plaintiff's supervisor, subjected Plaintiff to unwelcome, derogatory, and demeaning comments about her pregnancy, including remarks belittling her pregnancy, her emotions, and the possibility of miscarriage.

85. This conduct was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and to create a hostile, humiliating, and abusive working environment because of her pregnancy.

86. Defendant's conduct was outrageous and egregious, and was undertaken intentionally or with reckless indifference to Plaintiff's rights under G.L. c. 151B, warranting an award of punitive damages.

87. As a direct and proximate result of the hostile work environment in violation of G.L. c. 151B, § 4(1), Plaintiff has suffered and continues to suffer severe emotional distress, along with lost wages, lost benefits, and lost earning capacity, for which she is entitled to damages and other relief.

## COUNT III
**Retaliation**
**(G.L. c. 151B, § 4(4))**
***Against Defendant Massachusetts Institute of Technology***

88. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

89. G.L. c. 151B, § 4(4) makes it an unlawful practice to discharge or otherwise discriminate against a person because she has opposed practices forbidden under Chapter 151B.

90. Plaintiff engaged in protected activity, including by requesting a pregnancy-related accommodation and by reporting to Division leadership that her supervisor had subjected her to pregnancy-related discrimination.

91. Defendant took materially adverse action against Plaintiff because of her protected activity, including by ending her employment shortly after she reported discrimination.

92. The close temporal proximity between Plaintiff's protected activity and Defendant's decision to end her employment, together with Defendant's shifting and pretextual

explanations, establishes a causal connection between the protected activity and the adverse action.

93. Defendant's conduct was outrageous and egregious, and was undertaken intentionally or with reckless indifference to Plaintiff's rights under G.L. c. 151B, warranting an award of punitive damages.

94. As a direct and proximate result of Defendant's retaliation in violation of G.L. c. 151B, § 4(4), Plaintiff has suffered and continues to suffer lost wages, lost benefits, lost earning capacity, and severe emotional distress, for which she is entitled to damages and other relief.

## COUNT IV

**Pregnancy Discrimination, Hostile Work Environment, and Retaliation**
**(Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e et seq.)**
***Against Defendant Massachusetts Institute of Technology***

95. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

96. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, prohibits discrimination against an employee with respect to the terms, conditions, or privileges of employment because of sex. As amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), discrimination "because of sex" includes discrimination because of pregnancy, childbirth, or related medical conditions. Title VII, 42 U.S.C. § 2000e-3, further prohibits retaliation against an employee because she has opposed an unlawful employment practice.

97. At all relevant times, Plaintiff was pregnant, and Defendant was a covered employer within the meaning of Title VII.

98. Defendant discriminated against Plaintiff because of her pregnancy, subjected her to a hostile work environment because of her pregnancy, and retaliated against her because she opposed pregnancy discrimination, all in violation of Title VII. Defendant's stated reasons for its adverse actions were pretextual.

99. Defendant's conduct was undertaken with malice or reckless indifference to Plaintiff's federally protected rights.

100. As a direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered and continues to suffer lost wages, lost benefits, lost earning capacity, and severe emotional distress, for which she is entitled to compensatory and punitive damages, attorneys' fees, and other relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Amanda Clark respectfully requests that this Court enter judgment in her favor and against Defendant as follows:

A. A declaratory judgment that the actions, conduct, policies, and practices of Defendant complained of herein violated Plaintiff's rights under G.L. c. 151B, including the Massachusetts Pregnant Workers Fairness Act, Title VII of the Civil Rights Act of 1964 as amended by the Pregnancy Discrimination Act, and the federal Pregnant Workers Fairness Act;

B. A permanent injunction restraining Defendant and its officers, agents, successors, employees, and representatives from engaging in pregnancy discrimination, from failing to accommodate pregnant employees, and from retaliating against employees who assert their rights under G.L. c. 151B, Title VII, and the federal Pregnant Workers Fairness Act;

C. An award of damages against Defendant in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and economic harm, including back pay, front pay, lost wages, lost benefits, and lost earning capacity, together with reinstatement or, in lieu thereof, front pay;

D. An award of damages against Defendant in an amount to be determined at trial to compensate Plaintiff for all non-monetary harm, including emotional distress, mental anguish, anxiety, stress, humiliation, and loss of enjoyment of life;

E. An award of punitive damages in an amount sufficient to punish Defendant and to deter Defendant and other employers similarly situated from future misconduct;

F. An award of reasonable attorneys' fees, costs, and expenses pursuant to G.L. c. 151B, § 9, Title VII, 42 U.S.C. § 2000e-5(k), the federal Pregnant Workers Fairness Act, and any other applicable law;

G. Prejudgment and post-judgment interest on all amounts awarded; and

H. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

PURSUANT TO FED. R. CIV. P. 38(b), PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

Respectfully submitted,

PLAINTIFF,
AMANDA CLARK,
By her attorneys,

By: S. Amy Spencer

S. Amy Spencer (BBO # 568925)
Samuel Valas (BBO # 717234)
**GREENBERG GROSS LLP**
101 Federal Street, 19th Floor
Boston, Massachusetts 02110
Telephone: (617) 800-9065
aspencer@ggtriallaw.com
svalas@ggtriallaw.com
*Counsel for Plaintiff*

Dated: October 13, 2026